IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| L.A. JEFFERSON,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | Case No: 09 C 7536<br><br>Magistrate Judge Jeffrey Cole |

## MEMORANDUM OPINION AND ORDER

The plaintiff, L.A. Jefferson, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Jefferson asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.

### PROCEDURAL HISTORY

Mr. Jefferson has applied for disability benefits at least three times. The first time was in 1994, but he abandoned his claim when it was finally denied in 1998. (Administrative Record ("R.") 111-13, 133). His two more recent applications are consolidated in this case. He applied for SSI in November 2003, alleging that he had become disabled on September 30, 2003, due to carpal tunnel syndrome, asthma, and difficulty with reading and math. (R. 87-89, 98). His application was denied initially

and upon reconsideration. (R. 73-86). Mr. Jefferson filed a timely request for hearing but when he failed to appear, the administrative law judge ("ALJ") dismissed his claim. (R. 46-48). The Appeals Council remanded the case because it appeared that Mr. Jefferson had not received notice of the hearing, and the ALJ failed to contact him for an explanation of his failure to appear. (R. 43-44).

On remand, that claim was consolidated with subsequent claims for SSI and DIB that Mr. Jefferson filed in October 2006. (R. 25). An ALJ held a hearing on January 24, 2008, at which Mr. Jefferson, represented by counsel, appeared and testified. (R. 477-528). In addition, Ed Pagello testified as a vocational expert. (R. 520-27). On February 11, 2008, the ALJ issued a decision finding that Mr. Jefferson was not disabled because he retained the capacity to perform a limited range of light work, which allowed him to do jobs that exist in significant numbers in the national economy. (R. 25-36). This became the final decision of the Commissioner when the Appeals Council denied Mr. Jefferson' request for review of the decision on October 15, 2009. (R. 7-10). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Jefferson has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Mr. Jefferson was born on September 6, 1953, making him fifty-four years old at the time of the ALJ's decision. (R. 87). He made it through the ninth grade, and had to

take special education courses. (R. 490-91). At the time of his hearing, he had been homeless, off and on, for a long time. (R. 493-94). He is 5'8" and 238 pounds. (R. 165). His work history consisted mostly of day labor through temp agencies. The longest position he held was as a meat deboner in a meat packing plant. (R. 493-94). He also worked as a fast food cook. His past work was light to medium work and unskilled – with the exception of the cook job, which was semiskilled. (R. 520). He worked intermittently through 2006, and in 2005, earned enough to qualify as having performed substantial gainful activity. (R. 293-94, 303-04, 510).

**B.**

**Medical Evidence**

Mr. Jefferson has a few different medical problems, including chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), bilateral carpal tunnel syndrome (CTS), residual effects from an injury to his left knee, and psychological limitations. The record includes notes from Mr. Jefferson's visits to county hospital emergency rooms for treatment, mostly for his breathing problems. Many of the notes are illegible or fail to suggest how his ailments might affect his ability to work. But the record does include some more informative documentation.

Mr. Jefferson had a consultative mental status examination with Roland Manos, Ph.D., on December 3, 2003. Disabled or not, Mr. Jefferson probably wouldn't fare well at a job interview. During the evaluation, he chewed on a toothpick throughout the evaluation and spit pieces of it on the psychologist's carpet. (R. 158). He was irritable at times. His hygiene was substandard, although he was not homeless at the time – he was staying with a friend of his brother. (R. 158, 160). His effort during testing was below

average. His responses to questions were vague and contradictory at times. (R. 159). He didn't do too well recalling items, digits, or past presidents. He couldn't perform serial three subtractions from one hundred. He exhibited little ability to do any abstract thinking. (R. 160). Testing put Mr. Jefferson in the mild range of mental retardation. Results on the Wechsler Adult Intelligence Scale were 61 verbal IQ, 62 performance IQ, and 58 full scale IQ. (R. 161-62). On the verbal scale, all his abilities were significantly below average; they were below average on the performance scale. There was a significant impairment in his pychomotor speed, visual motor coordination, visual processing, and verbal reasoning. But, it was noted that these results were likely an under-representation of Mr. Jefferson's actual abilities. In any event, Dr. Manos thought his level of functioning and intelligence were in the borderline range. (R. 162). He assigned Mr. Jefferson a GAF score of 60.[1] He could understand and carry out simple instructions, and appeared to be capable of responding appropriately to supervisors and co-workers. (R. 163).

Mr. Jefferson had a consultative physical examination with Dr. Neil Johnson on January 10, 2004. (R. 164). Although he said he had asthma since childhood, he was a smoker for 25 years, and currently smoked five or six cigarettes daily. Breath sounds were reduced but there was no wheezing. (R. 166). There were multiple scars on his left knee – he suffered a chainsaw injury – and pain and crepitus on range of motion, which was significantly limited. Tinel's sign was strongly positive bilaterally for irritated

---

[1] The Global Assessment of Functioning (GAF) is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. A GAF score of 51 - 60 denotes moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning.

nerves. He exhibited manipulation problems: he couldn't pick up a button or a coin, and had trouble zipping a zipper. (R. 165). According to a dynamometer measurment, pinch and grip strength was reduced. (R. 168). Dr. Johnson felt that Mr. Jefferson would be unable to stand or walk for long periods, and would have significant problems with his hands. (R. 166).

On February 20, 2004, Anthony Matkom, Ph.D., reviewed the record for the Agency. He said there was insufficient evidence to perform a psychiatric review. (R. 177-190). Someone else – the name is illegible (R. 199) – reviewed the file from a physical perspective on February 23, 2004. They thought Mr. Jefferson could lift 20 pounds, carry ten, and sit, stand, and walk for six hours out of every work day. (R. 192). There were no postural, manipulative, or environmental limitations. (R. 194-196).

The next day, another Agency psychologist, Michael Mandli, reviewed the file. Unlike his predecessor, he felt there was enough evidence to determine that, due to mental retardation (R. 217), Mr. Jefferson was moderately limited in the areas of understanding, remembering, and carrying out detailed instructions, accepting instruction and criticism, responding appropriately to changes in a work setting, and setting realistic goals and planning independently of others. (R. 232-33). He thought Mr. Jefferson was capable of performing routine, unskilled work. (R. 234).

On August 4, 2004, Dr. Dan Muceno reviewed the file for the Agency and reached nearly the same conclusions as his predecessor in terms of Mr. Jefferson's physical capacity. The only difference was that Dr. Muceno thought Mr. Jefferson was limited in his ability to handle and finger objects (R. 239), and should avoid concentrated exposure to fumes, odors, and dust. (R. 240).

On February 10, 2007, Mr. Jefferson had another consultative physical examination, this time with Dr. Afiz Taiwo. (R. 386). Mr. Jefferson's weight was 241 pounds and his blood pressure was 148/90. He was short of breath while talking and wheezed with exertion. (R. 388). There was a scar on each wrist from previous carpal tunnel surgery. Mr. Jefferson's grip strength was reduced to 3/5. His ability to grasp and manipulate objects was abnormal. His ability to make fists and oppose finger was "weak." Tinel's sign and Phalen sign were both positive for carpal tunnel syndrome. Gait was non-antalgic when Mr. Jefferson walked fifty feet, but he was unable to heel/toe walk. Range of motion in the knees was normal. Range of motion in the lumbar spine was limited to 90 degrees due to obesity. (R. 388). A pulmonary function test revealed moderate restrictions. (R. 389-392).

On February 28, 2007, Dr. Richard Bilinsky, a physician with the Agency, found that Mr. Jefferson could lift up to twenty pounds, and carry ten. He could stand, walk, or sit for six hours in a work day. There was no limitation on his ability to push and pull. (R. 394). He could only occasionally climb ladders, scaffolds, or ropes. (R. 395). Mr. Jefferson's ability to reach and perform fine manipulations was unlimited; he could do them constantly. His ability to perform gross manipulations was limited to "frequent." (R. 397). He had to avoid concentrated exposure to fumes and dust and hazards like machinery and heights. (R. 397). Dr. Bilinsky's findings were apparently based on Dr. Taiwo's consultative examination. (R. 400).

Mr. Jefferson sought treatment at Stroger Hospital emergency room in June 2007 for coughing and chest pain. He was unable to walk more than a few steps with out shortness of breath. He was hospitalized for three days, and treated with steroids,

bronchodilators, and antibiotics. He was also placed on a CPAP, which alleviated his sleep apnea. While he had the opportunity to arrange for a CPAP at Stroger, he indicated he would follow up in Joliet. (R. 410-02). He was discharged with Albuterol, QVAR, Prednisone, and Levaquin. (R. 402).

Dr. Sapkota, the physician who treated Mr. Jefferson at Stroger, filled out a physical assessment form on June 4, 2007. He stated that Mr. Jefferson had chronic obstructive pulmonary disease and severe obstructive sleep apnea. (R, 407-08). He felt his ability to walk was reduced by more than 50%; his ability to sit, bend, stoop, climb, push, and pull was reduced by up to 20%, and his ability to stand was normal. (R. 409). He could lift no more than ten pounds at a time. (R. 409).

## C.

## Administrative Hearing Testimony

### 1.

### Plaintiff's Testimony

At the hearing, Mr. Jefferson testified that he was homeless, and sleeping outside of a WalMart. (R. 487). He wasn't allowed at the shelter because of the snoring from his sleep apnea. (R. 487). He also got to spend seven days a month at a motel through public aid. (R. 488). He said he quit school after ninth grade and didn't seem sure whether he ever got a GED. (R. 490). He was in "slow" classes while in school. (R. 490). He had been separated from his wife for ten years. (R. 492). His children were all adults. (R. 492).

Mr. Jefferson discussed some of his day labor assignments. For many years, he loaded trucks with boxes of meat. (R. 494). He was also a fast food cook. (R. 494). His

last job was packing product in a box in 2005, when he earned $10,000. (R. 494-95). He did some work for a temp agency in 2006, but had not worked at all the year prior to his hearing. (R. 495). He said he couldn't because 'his breathing [was] destroyed." (R. 496).

Mr. Jefferson explained that he had to use emergency rooms for medical care because he had no insurance. (R. 497). Will County gave him his inhalers and Joliet Township paid for his medicine. (R. 500). He got a sleep apnea machine – a CPAP – from Will County. (R. 503). Mr. Jefferson said his medication made him light-headed and he had a hard time walking. (R. 504). Sometimes he coughed so much he passed out. (R. 512). This happened almost every day. (R. 513). But he still smoked about two or three a day if he was able to borrow them. (R. 514). He said it relieved some of the stress of his situation. (R. 514).

Mr. Jefferson related that he had carpal tunnel surgery on both wrists, but it had gotten worse. (R. 506). He had been given pain medication for his hands, and doctors told him they wanted to focus on his breathing problems first. (R. 508). His hands hurt when he used them. At one of his more recent jobs, he wore three or four pairs of gloves and said, because he was homeless, he had to endure the pain. (R. 510). He soaked his hands in water at the end of the day. (R. 510). But he was finally told he couldn't do it any more. (R. 511). He was not allowed back unless a doctor cleared him . (R. 511).

Mr. Jefferson told the ALJ about his chainsaw accident in 2001, and how doctors put 290 staples in his leg. (R. 515). He had pain there all the time, especially in bad weather. (R. 515). Doctors gave him pain relievers for that as well. (R. 516). Mr. Jefferson explained that his knee caused him sharp pain so that he had to sit down after a

while, but then, when he used his hands, they would hurt, too. (R. 517). And at one of his packing jobs, his employer told him his breathing and coughing problems were too severe to allow him to keep working there. (R. 517-18). After a while, the temp agency simply stopped calling him. (R. 517).

2.

**Vocational Expert's Testimony**

Ed Pagello then testified as a vocational expert. He classified Mr. Jefferson's past work as ranging from light to medium and unskilled to semiskilled. (R. 520): The semiskilled position was fast-food cook. (R. 520); the nursing home job was skilled, sedentary work. (R. 47-48). The ALJ asked the VE to assume a person were limited to light work, with no climbing of ladders, ropes, or scaffolds, occasional climbing of ramps and stairs, occasional balancing, stooping, kneeling, crouching, and crawling, should avoid unprotected heights and dangerous machinery, overexposure to cold temperatures, and dust, and could do no more than frequent handling. The VE said the person could perform Mr. Jefferson's past work as a packer and a fast food cook, as well as a variety of other jobs. (R. 521). These included usher (1600 positions in the region), information clerk (4800), and host (7200). (R. 521). If the person were further limited to only occasional handling and fingering, the person could perform the usher, clerk, and host positions, which require being on your feet six hours of every work day. (R. 522-23). They wouldn't be able to work at manufacturing or clerking positions due to the handling and fingering. (R. 522). If they were limited to sedentary work, there would be no jobs they could perform. (R. 522). The VE later confirmed for Mr. Jefferson's attorney that these were unskilled positions. (R. 523).

Mr. Jefferson's attorney asked if a person that had difficulty accepting and responding to instructions could perform those jobs; the VE indicated that would be a problem if it happened three times. (R. 523). There would be no impact if a person couldn't respond to changes in a work setting because change would be minimal, at most, in these positions. (R. 524). The ability to maintain concentration 84% of the time would be required in all occupations. (R. 525).

## D.

### ALJ's Decision

The ALJ found that Mr. Jefferson suffered from the following severe impairments: COPD, obstructive sleep apnea, history of carpal tunnel syndrome, old left knee injury and borderline intellectual functioning. (R. 28). She reviewed the medical evidence concerning these impairments, and determined that Mr. Jefferson did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 30). She specifically considered pulmonary functioning under listings 3.02 and 3.03, and mental retardation under listing 12.05. (R. 30-31).

Next, the ALJ determined that Mr. Jefferson could perform light work as long as it was "simple, repetitive, and therefore unskilled," and required no more than occasional climbing of ramps and stairs – but no climbing of ropes, ladders, or scaffolds – and no more than occasional balancing, stooping, kneeling, and crawling. Mr. Jefferson had to avoid concentrated exposure to moving machinery, heights, extreme temperatures, and pulmonary irritants. He could frequently handle and finger objects. (R. 32). Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted

may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b); 416.967(b). The ALJ found that Mr. Jefferson's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." (R. 33). She noted he smoked despite his pulmonary impairment, walked fourteen blocks to the hospital, and that the record was inconsistent regarding his grip strength – "[r]ange of motion, finger opposition and ability to make a fist were full." (R. 33). She noted that his impairments were long-standing and he had worked despite them in the past. (R. 34). There was no record of prescriptions for pain killers. (R. 34). She noted that several consultants had detailed their opinions as to the reasons why the claimant's complaints as to difficulty with grip and manipulation are entirely unsupported by the objective record . . . ." (R. 34). The ALJ determined that Mr. Jefferson could not perform his past work but, relying on the VE's testimony, concluded that Mr. Jefferson could perform jobs existing in significant numbers in the regional economy. (R. 35-36). As a result, she concluded that Mr. Jefferson was not disabled. (R. 36).

## IV.

## DISCUSSION

### A.

### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind

might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.

## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

## Analysis

Mr. Jefferson cites several problems with the ALJ's opinion, but this review will focus on one that requires a remand: the ALJ's treatment – or lack thereof – of the

medical opinions of an examining and treating physician. While the ALJ summarizes the findings of Dr. Johnson's consultative examination, she fails to mention his opinion that Mr. Jefferson was unable to stand or walk for long periods, and would have significant problems with his hands. She completely ignores the opinion of Dr. Sapotka – who treated Mr. Jefferson, albeit briefly – that Mr. Jefferson's ability to walk was reduced by more than 50% and that he could lift no more than ten pounds at a time. She says only that Mr. Jefferson "was admitted to Stroger Hospital from June 2, 2007 to June 5, 2007." (R. 29).

An ALJ can't simply ignore a line of evidence that is contrary to her conclusion. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir.2009). If a person can't walk for long periods of time, they would seem unable to perform a job that requires them to "be capable of being on their feet six out of eight hours throughout the course of the day," as the VE testified. (R. 522). And it's unlikely that someone who has significant problems with their hands could perform frequent handling and fingering. But the ALJ didn't even address these opinions.

Moreover, the ALJ is required to provide a certain level of analysis if she rejects opinions of treating or examining physicians. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005). This rule takes into account the treating physician's advantage in having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop, such as friendship with

the patient.  *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Dixon,* 270 F.3d at 1177.  In deciding how much weight to accord a treating physician's opinion, the ALJ should consider various factors, like how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth; consistency with the record and support are rolled back into the equation as well.  *Id.* at 377; 20 C.F.R. § 404.1527(d).  Simply put, if an ALJ does not give the treating physician's opinion controlling weight, she has to provide  "good reasons" for how much weight she accords it.  *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  An examining physician's opinion is entitled to less weight that a treating physician's, but an ALJ still can't reject it out of hand.  She has to determine the weight she decides to accord it and must explain her reasoning.  *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008).  And those reasons must be supported by the record.  *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Clearly, if the ALJ doesn't so much as mention a medical opinion, she doesn't meet these requirements.  The Commissioner argues that there were four non-examining physicians that found Mr. Jefferson could do light work, and that there are a number of things that detract from the opinions of Drs. Johnson and Sapotka.  But the Commissioner's reasoning is not up for review, the ALJ's is.  *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)("[the] agency's lawyers [may not] . . . defend the agency's decision on grounds that the agency itself had not embraced."); *Stewart v. Astrue* , 561 F.3d 679, 684 (7th Cir. 2009)(". . . in reviewing that determination a court must confine itself to the reasons supplied by the ALJ.").  Moreover, the ALJ would certainly have had

15

to go into some depth in order to favor the opinions of non-examining physicians over those of treating and examining physicians. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."). But the ALJ didn't do that here. Because the ALJ failed to address two medical opinions that conflicted with her conclusion, this case must be remanded.

A few other points are worth noting. The Commissioner makes much of the fact that, in the notes covering Mr. Jefferson's hospitalization in October 2003, it is said that he walked fourteen blocks to the hospital. The ALJ mentions this as well, although not as a reason for discrediting any of the medical opinions. But this was a single occasion, *see Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004)(" . . . we cannot see how [claimant's] being able to walk two miles is inconsistent with her suffering severe pain."), from a time when Mr. Jefferson was still working – recall that he performed substantial gainful activity in 2005, and worked intermittently prior to that. Moreover, it's not clear that a homeless man who needed treatment would have any choice. *Cf. Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005)(claimant had no choice but to take care of her child). So, it's not the type of thing that an ALJ should put too much stock in. *See Carradine*, 360 F.3d at 756 ("The weight the administrative law judge gave to Carradine's ability to walk two miles was perverse . . . .").

Some of the characterizations the ALJ gives the evidence don't bear scrutiny. She says that the evidence regarding Mr. Jefferson's grip strength was "inconsistent . . . in one instance finding reduced grip strength and, in another, finding full grip strength."

(R. 33). Actually, the only two measurements of grip strength find it reduced by at least 40%. (R. 168, 388). She says she is "mindful that several consultants have detailed their opinions as to the reasons why the claimant's complaints as to difficulty with grip and manipulation are entirely unsupported by the record . . . ." (R. 34). She does not indicate who these "several consultants" are or where their reports can be found in the record. As just noted, the two consultative exams that evaluated grip strength found it significantly reduced.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#16] is GRANTED, and the Commissioner's motion for summary judgment [#22] is DENIED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 4/21/11